**STATE of Missouri, Respondent,**

v.

**Cecil MOODY, Jr., Appellant.**

**No. 12533.**

Missouri Court of Appeals,
Southern District,
Division Three.

Dec. 13, 1982.

Motion for Rehearing or to Transfer
Denied Dec. 30, 1982.

Application to Transfer Denied
Feb. 23, 1983.

King E. Sidwell, Jere L. Hargrove, Blanton, Rice, Gilmore & Sidwell, Sikeston, for appellant.

John Ashcroft, Atty. Gen., Lew A. Kollias, Kristie Green, John C. Reed, Asst. Attys. Gen., Jefferson City, for respondent.

FLANIGAN, Judge.

A jury found defendant Cecil Moody, Jr., guilty of violating § 565.004,[1] "conventional"[2] murder in the second degree, and he was sentenced to 30 years imprisonment. Defendant appeals.

▮ Defendant's first point is that the evidence was insufficient to support the verdict. In ruling defendant's contention this court must view the evidence in the light most favorable to the state and accept all substantial evidence and all legitimate inferences fairly deducible therefrom which tend to support the verdict. All evidence unfavorable to the state must be disregarded and the submissibility of the case will be determined upon the basis of all of the evidence, including those portions of defendant's evidence which favor the state. *State v. Leach,* 633 S.W.2d 754, 755[1] (Mo. App.1982).

Section 565.004 defines murder in the second degree as follows: "All other kinds of murder at common law, not herein declared to be manslaughter or justifiable or excusable homicide."

▮ Section 565.004, which includes both conventional second degree murder and felony murder in the second degree, remained unchanged with the enactment of "The Criminal Code," which became effective in 1979. See § 556.011. Section 565.004 is not a "code offense." The elements of conventional second degree murder are "the (1) willful, (2) premeditated, (3) killing, (4) of a human being (5) with malice aforethought." A "willful" act is one done "intentionally" or "knowingly." "Premeditation" means "thought of beforehand for any length of time, however short." *State v. Mannon,* 637 S.W.2d 674 (Mo. banc 1982).

▮ Recklessness is "a part of" manslaughter and recklessness is not sufficient to establish the requisite culpability for conventional second degree murder. The element of intent, required for conviction of conventional second degree murder, is met by proof "that the defendant specifically intend[ed] to kill or specifically intend[ed] to do great bodily harm." That element is a required finding in paragraph "Second" in MAI–CR 2d 15.14. It is not a mere "general intent." *Mannon, supra.*

Although the court, in *Mannon,* did not define the requirement of "malice aforethought," that element is discussed in *State v. Smart,* 485 S.W.2d 90, 93 (Mo.1972). There the court said that "malice" or "malice aforethought," as an element of conventional murder in the second degree, "does

---

1. All references to statutes are to RSMo 1978, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

2. "The term 'conventional' second-degree murder is used to distinguish it from felony murder in the second degree. See MAI–CR 2d 15.14 for murder—second degree—conventional and MAI–CR 2d 15.16 for murder—second-degree —felony." *State v. Mannon,* 637 S.W.2d 674 (Mo. banc 1982).

not mean spite or ill will, but the intentional doing of a wrongful act without just cause or excuse."

The homicide victim was 21-year-old Billy Pullam who died at approximately 4 a.m. on December 6, 1980, as a result of a gunshot wound inflicted by the defendant. Billy had spent the evening of December 5 at a cafe-pool hall which was owned by Paul Wilcox and was located at Braggadocio, Missouri. Billy's companions in a pool game were Wilcox and two teenage boys, Brad Pickens and Gary Riddick. At approximately 1 a.m., December 6, these four people went to the Curtis Cafe in Hayti, Missouri, 10 miles from Braggadocio. After they had been in the cafe a few minutes the defendant arrived, accompanied by a woman named "Dee Dee" Duszcyak, and that couple sat down at a nearby table.

An argument developed between defendant and Billy. Defendant accused Billy of staring at defendant and his companion and defendant said to Billy, "Do you see something over here you want?" In a few minutes defendant and Dee Dee were joined by Johnny Mitchell and Kathleen Lee. The argument continued and at one point defendant arose and started toward Billy's table but then returned to his own table.

Billy's group finished their meal and while they were paying their checks defendant and Mitchell went outside the cafe to await them. Gary and Brad left the cafe unmolested but when Billy and Wilcox went out, the argument with defendant and Mitchell resumed. Police were summoned and they came to the scene. The argument was broken up and Billy and his companions returned to Braggadocio, arriving there at approximately 2 a.m.

Paul Wilcox, one of Billy's companions, owned a service station located at the southeast corner of the principal intersection in Braggadocio, a town with a population of approximately 250. At the northwest corner of the intersection was the trailer home of witness Russell Darnell.

Upon their arrival in Braggadocio Billy and the two teenagers dropped Paul Wilcox at his house which was located about 100 yards south of the service station. Billy, Brad and Gary then went to the service station and the three of them got into Billy's truck which was parked there. The trio remained there, talking, for an hour or so until the happening of the fatal events.

Defendant and his three companions drove to Braggadocio in defendant's Cougar. Dee Dee was driving and defendant sat on the passenger's side of the front seat of the two-door Cougar. Kathleen Lee and Mitchell were in the back seat. Upon their arrival in Braggadocio defendant's group saw Billy and the two boys at the service station. Defendant instructed Dee Dee to drive to Caruthersville which was 12 miles from Braggadocio. He told her to go to the house of Dallas Taylor in Caruthersville and Dee Dee complied. Defendant testified that the purpose in going to Caruthersville was that "I wanted to bring Dallas out there so we could even up the odds."

Upon arriving in Caruthersville defendant went into Taylor's house and found that Taylor was not home. Defendant obtained there a 30-caliber lever-action Winchester rifle, the murder weapon. Defendant's group then returned to Braggadocio.

Dee Dee drove the Cougar onto the parking lot of the service station. Kathleen Lee and Mitchell got out of the Cougar through the driver's door. Kathleen went up to the truck containing Billy and the two boys. Billy was in the driver's seat. Kathleen said, "Come on, get out, we are going to fight, the driver is the one we want." Billy said, "I don't want any trouble." Mitchell began removing his coat. Dee Dee and the defendant were still in the Cougar.

Billy immediately "started to leave fast." The truck, driven by Billy, started to go north and then made a U-turn, "like it spun," and went south. The truck was "fishtailing" in the process of its rapid departure.

While the truck was entering the north-south highway, departing from the scene, a single shot rang out. Defendant was then outside the truck and the rifle was in his hand. None of his companions was near

him. The bullet struck the tailgate of Billy's truck, a pickup, continued on its trajectory into the cab of the truck and struck Billy in the back. This occurred when defendant was approximately 75 feet from the departing truck.

Awakened by the shot, state's witness Russell Darnell went to the window of his trailer, looked toward the service station, and saw "a man" down on his knees. The man had a rifle in his hand and he had the rifle "up," pointed southwest.

Brad, who was seated in the middle of the truck, grabbed the steering wheel and drove to the yard of the nearby Wilcox house. Billy left the truck and collapsed on the porch of the house. His death occurred almost immediately thereafter.

Defendant, testifying on his behalf, denied getting the rifle in Caruthersville. The testimony of his three companions supported the finding, however, that the murder weapon was obtained by him at Caruthersville and indeed may have been the purpose of going there. Dee Dee testified that the defendant, a month after the shooting, asked her to testify falsely that she "got the gun that afternoon and that I already had it in the car when all of this happened."

Defendant's testimony was to the effect that he got out of the Cougar, gun in hand, for the purpose of scaring Billy and his companions. Defendant said that he intended to shoot the rifle in the air in order to frighten the boys. It was his testimony that he "reached back" in the back seat and got the rifle. "I tripped going out the door and I had started to cock the rifle. The rifle went off. I fell to where my hands hit the ground. It was one continuous motion, getting out of the car and then stumbling and then hitting the ground and then getting up. I cocked the gun as I started out of the car and I was cocking it as I fell."

Although Kathleen and Mitchell had been sitting in the back seat, neither saw the rifle nor was aware of its presence until they heard the gun shot.

Dee Dee testified, in rebuttal of defendant's testimony, that defendant, during the process of alighting from the Cougar, "did not ever kneel or get into a kneeling position or crouch down. He was standing up all the time. Defendant did not fall out on the ground when he opened the car door." Dee Dee also testified that while defendant was leaving the Cougar, defendant "jerked the gun up and shot it. It was all in one motion."

It was the testimony of Brad Pickens that he saw the defendant immediately after the shot was fired and defendant was standing "straight up." After the shot Kathleen saw the defendant holding the rifle and the defendant was standing "fairly straight" with the barrel of the gun pointed south toward the departing pickup.

After the shot was fired defendant broke the rifle by hitting the "wood part of it" against a car parked on the service station lot. The gun broke into several pieces. Defendant picked up the pieces and put them in the front seat. En route to Dee Dee's home in Hayti, Dee Dee stopped the Cougar and defendant put the broken gun into the trunk. The police arrested defendant and his companions at Hayti at approximately 6 a.m.

■ The jury did not accept defendant's version of the shooting. The jury properly could have found that defendant did not trip while getting out of the Cougar. His testimony that he intended to shoot the gun into the air for the purpose of frightening the boys may have aroused skepticism in light of the fact that the truck driven by Billy was rapidly departing from the scene before the shooting occurred.

Defendant's argument with Billy, both inside and outside the Curtis Cafe, the trip to Braggadocio in pursuit of Billy and his companions, the trip to Caruthersville to obtain the murder weapon, defendant's concealment of the weapon from his companions, the confrontation of Billy and his companions at the service station lot, the use of the rifle in shooting it toward the fleeing truck, the breaking of the weapon after the shooting and the concealment of it in the trunk are all conduct on the part of the defendant from which the jury could

find the requisite intent. The jury was not required to believe the defendant's testimony that the shooting was accidental.

Under the foregoing evidence the jury was justified in finding that defendant willfully, and with premeditation, killed Billy Pullam, and did so intentionally without just cause or excuse. The evidence was sufficient to support the verdict. See *State v. Woolford,* 545 S.W.2d 367, 372 (Mo.App. 1976). Defendant's first point has no merit.

Defendant's second point is that the trial court erred in permitting witness Russell Darnell to testify as a rebuttal witness for the state because: (a) "Darnell's testimony was not the proper subject of rebuttal in that it did not rebut defendant's evidence but was clearly relied upon by the state to contradict testimony given by the state's own witnesses which was favorable to the defendant" and (b) "Defendant was not given notice of such testimony until the day before trial so that defendant was surprised and left without proper time to adequately prepare for or investigate Darnell's testimony."

■ The scope of rebuttal testimony rests within the broad discretion of the trial court and the appellate court will not interfere in the absence of an abuse of that discretion. *State v. Crain,* 638 S.W.2d 761, 762[1] (Mo.App.1982). Authorities cited in *Crain* hold that "[r]ebuttal testimony is not necessarily inadmissible merely because it is cumulative of the state's evidence in chief or because it would have been better procedure for it to have been offered as part of the state's evidence in chief rather than in rebuttal."

In the instant case the state made an unsuccessful effort to offer Darnell in support of its case in chief. On the morning of the trial, and prior to its commencement, the prosecutor informed the court that the preceding day he had learned that Darnell was a possible witness and that he had promptly relayed that information to the defendant's attorney, Mr. Copeland. The prosecutor made arrangements for attorney Copeland to interview the witness during the noon·recess and Copeland did so. The prosecutor sought permission to add Darnell's name to the list of state witnesses on the information and to the list contained in the state's listing of witnesses pursuant to Rule 25.03. The court refused the prosecutor's requests and did not permit the witness to testify during the state's case in chief.

After defendant testified in his own behalf with regard to his version of the shooting, Darnell testified for the state in the manner previously described.

Rule 23.01, dealing with listing on the information of material witnesses for the prosecution, specifically excepts rebuttal witnesses. It has also been held that "whether a witness may be a proper rebuttal witness is determined by the trial court without regard to [Rule 25.03] . . . ." *State v. Cameron,* 604 S.W.2d 653, 657 (Mo.App. 1980).

■ This court rejects defendant's argument that Darnell's testimony did not rebut defendant's evidence. Darnell saw a man who was down on his knees holding the rifle "up," pointed southwest toward the fleeing truck. Although Darnell could not identify defendant as the man, defendant was the only man who held the gun. The jury could properly have found that Darnell's testimony was inconsistent with defendant's evidence with regard to his tripping.

■ Defendant argues that some of the state's witnesses testified that the defendant was standing erect and that such testimony was favorable to defendant and was contradicted by Darnell's testimony. The difficulty with defendant's position is that the state is under no duty to produce witnesses whose respective testimonies are totally consistent.[3] It would be a rare case

---

**3.** "The State was not bound by the testimony of its witness Wilson because, for one reason, there was other evidence from which the jury could find the material facts contrary to his testimony. The credibility, weight, effect and value of the testimony of a witness is for the jury, which may believe all, or none, or any part of a witness' testimony and find the facts

**158**

indeed where the state's witnesses did not conflict on various points.

The direct examination of Darnell by the prosecutor was very brief, only two and one-half pages in length, and defense counsel cross-examined him skillfully for eight pages. Darnell's identity was disclosed to defense counsel as soon as it was learned by the prosecutor. The situation is not similar to that found in *State v. Miner*, 639 S.W.2d 569 (Mo.1982), where a witness for the state was subpoenaed eight days before the trial but had not been disclosed under Rule 25.03. There the court said that the existence of the subpoena was evidence "of the probability of testimony from [the witness] and the state's intent to call her as a rebuttal witness. ... It is apparent that there was a partial failure to comply with the discovery rules." In *Miner*, however, the court found that although there was non-compliance with the rules, the trial court did not abuse its discretion in permitting the witness to testify. This court holds that the trial court did not abuse its discretion in receiving the testimony of Darnell as a rebuttal witness for the state. Defendant's second point has no merit.

Defendant's third point is that the trial court erred in receiving into evidence, over defendant's objection, state's Exhibit 11, a color photograph of the upper portion of the victim's back, showing the fatal wound. Defendant's position is that the exhibit "was needlessly inflammatory in that defendant stipulated the cause of death and the photograph could only arouse the emotions of the jury."

In *State v. Burnfin*, 606 S.W.2d 629 (Mo.1980), the defendant in a murder case objected to the introduction into evidence of a photograph of the murder victim showing three gunshot wounds to his chest. In holding that the exhibit was properly admitted into evidence, the court said that the trial court has a broad discretion in determining the admissibility of demonstrative evidence. The court said that a photograph is usually superior to words as a means of description and "it should not be rejected because by presenting an accurate portrayal it tends to be inflammatory." The court said the photograph was no more gruesome than any photograph would be which showed a portion of the body of a person who died as a result of three gunshot wounds. The court also said that the photograph corroborated and enabled the jury "to better understand" the testimony of the doctor who performed the autopsy and who testified as to the cause of death. Similar testimony was given in the case at bar by the coroner. In *Burnfin* the court said: "Insofar as [the photograph] tends to be shocking or gruesome it is because the crime is one of that sort. ... We find no abuse of discretion in the admission into evidence of the photograph." This court makes the same finding here. Defendant's third point has no merit.

Defendant's fourth point is that the trial court erred in receiving into evidence, over defendant's objection, state's Exhibit 2, "because the court held no preliminary verification inquiry as to the accuracy and faithfulness of the things represented in the photograph in that the photograph was an attempted re-enactment and reconstruction of the scene of the incident which was not admissible into evidence without proper verification."

Exhibit 2 was received in connection with the testimony of Brad Pickens. The photograph, according to Pickens, is a view of a portion of the service station lot with the camera looking southwest toward the highway on which Billy drove the truck while fleeing from the scene. The truck shown in the photograph was Pickens' truck and he parked it, pursuant to the prosecutor's request, at the place "where Billy's truck was when the shot was fired." The witness also testified that he paced off the distance from the truck to the point where the defendant was standing after firing the shot.

As this court held in *State v. Shipman*, 568 S.W.2d 947, 954 (Mo.App.

in accord with the most credible evidence adduced. ... This rule is appropriate in criminal cases where the representative of the State offers the available witnesses to aid the jury in determining the true facts notwithstanding the testimony of given witnesses may be inconsistent with the contentions of the State. ..." *State v. Jones*, 363 Mo. 998, 255 S.W.2d 801, 804[4, 5] (1953). (Authorities omitted.)

1978), photographs of the scene of a crime are admissible "if they depict the conditions and circumstances surrounding the alleged crime and aid the jury in throwing light on a material issue in the case. . . . The accuracy of the photograph may be proved by anyone who knows the facts. . . . The fact that a photograph may be incorrect in certain particulars or that there are changes in the scene does not affect the admissibility of the photograph but only affects the weight to be given to it by the jury."

The testimony of witness Pickens was sufficient to support the admission of Exhibit 2 into evidence. The respective positions of the victim and defendant at the moment the shot was fired were material facts which the jury could consider in determining defendant's state of mind at that time. The photograph also aided the jury in understanding Pickens' testimony. Defendant's fourth point has no merit.

Judgment affirmed.

GREENE, C.J., and MAUS and PREWITT, JJ., concur.