**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Michael STITH, Defendant-Appellant.**

**No. 13149.**

Missouri Court of Appeals,
Southern District, Division One.

Oct. 19, 1983.

Motion for Rehearing or to
Transfer Denied Nov. 10, 1983.

Lee M. Nation, Kansas City, for defendant-appellant.

John Ashcroft, Atty. Gen., Kristie Green, Dan Crawford, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Presiding Judge.

A jury found defendant Michael Stith guilty of capital murder, § 565.001,[1] and he was sentenced to life imprisonment without the possibility of parole for 50 years. Defendant appeals.

Defendant's first point is that the evidence was insufficient to support the verdict. In ruling this point this court must view the evidence in the light most favorable to the state and accept all substantial evidence and all legitimate inferences fairly deducible therefrom which support the verdict. All evidence unfavorable to the state

---

1. All references to statutes are to RSMo 1978, V.A.M.S.

must be disregarded and the submissibility of the case will be determined upon the basis of all the evidence, including those portions of defendant's evidence which favor the state. *State v. Moody,* 645 S.W.2d 152, 154[1] (Mo.App.1982).

The murder victim was Dr. Duncan Danforth and the offense took place on Sunday, August 17, 1980. Dr. Danforth was survived by his widow, Loretta Danforth,[2] whom he had married the preceding Wednesday, August 13. Defendant was Loretta's "boyfriend" and he lived with her until a few days before the murder. Dr. Danforth was an elderly man of substantial means.

The record supports the following account:

### Tuesday, August 12, 1980

Defendant met Harrison "Detroit" Williams and Jack Pearcy at Sedalia. Williams and Pearcy, both ex-convicts, lived in Olathe, Kansas. Defendant had previously telephoned Williams and told Williams that "an old man was hassling" him and defendant wanted to know if Williams would kill the old man in return for a payment of $4,000.

Defendant was accompanied by Loretta, although she remained in defendant's car while defendant conferred with Williams and Pearcy. Defendant gave the other two men $1,500. An additional payment was to be made after the murder. Defendant gave them a photograph of Dr. Danforth's car and a photograph of Dr. Danforth. Defendant told them that Danforth and his bride-to-be were going to spend Wednesday night at the Breckenridge Inn in Kansas City and that the killing could take place at that time. Defendant said that Loretta would arrange for the victim to be in the parking lot of the hotel at 9:00 p.m. Wednesday. Defendant also said that the Danforth vehicle would carry a bumper sticker reading, "The world's greatest citizen," which defendant would place on that vehicle. Defendant admitted that the Se-

dalia meeting took place but his testimony was that the purpose of it was a sale by Williams to defendant of $3,000 worth of stolen drugs and some marijuana.

### Wednesday, August 13, 1980

Defendant telephoned Williams and told him that Dr. Danforth would be in the parking lot of the Breckenridge Inn at 9:00 p.m. That afternoon the marriage of Loretta and Dr. Danforth took place. Williams and Pearcy went to the Breckenridge, stalked Danforth, but did not kill him. The bumper sticker was on the Danforth car. There were "many windows facing the parking lot and many people were in the parking lot" so the two would-be murderers decided to postpone their fatal mission. They talked with Loretta who told them that Danforth was returning to his home at Climax Springs, Missouri, and was going to change his will because Loretta had not slept with him. The plan was made for the murder to take place after Danforth's return to his home.

### Thursday, August 14, 1980

Williams and Pearcy returned to Olathe. Williams telephoned defendant and told defendant they had not killed Dr. Danforth. Defendant told Williams that he had to "have it done and quick," and he wanted the two convicts to come to Climax Springs to do the job. Also on this day defendant had a conversation with Dr. Danforth in which Danforth called defendant "a mooch."

### Friday, August 15, 1980

Williams and Pearcy met defendant at Edwards, Missouri, near Climax Springs. Defendant took the two men to Loretta's house to show them the area. Defendant told them that he could arrange for Danforth to leave Loretta's house around 8:30 or 9:00 p.m. and the killing could take place at that time. Defendant also showed the two men where they could dispose of the body. Pearcy testified that in the evening he and Williams went to the area previously

2. Loretta Danforth was convicted of conspiracy to commit the capital murder of her husband and her ten-year sentence was affirmed on appeal. *State v. Danforth,* 654 S.W.2d 912 (Mo. App.1983).

shown them by the defendant and waited for Danforth to appear. Pearcy got out of his vehicle and stood by the side of the road. Pearcy was armed with a pistol. Danforth drove by but Pearcy decided not to kill him. Pearcy told Williams that he did not know it was Danforth but Pearcy said, "I knew it was the doctor but I did not shoot."

### Saturday, August 16, 1980

Williams and Pearcy met defendant at Edwards. Defendant drove the two men to the house of Dr. Danforth and showed them that area. Defendant told the two men that the Danforth house contained money and drugs and was worth burglarizing. Defendant suggested that the two convicts wait at the Danforth house until the doctor got home and then kill him.

On Saturday evening Williams and Pearcy were on a road near the doctor's house but a neighbor woman who lived nearby saw them and her suspicions were aroused. The two men "figured that she was writing down our license tags," so they left the area and returned to their home in Olathe.

### Sunday, August 17, 1980

Williams and Pearcy, having abandoned their intention to murder Danforth, were at their homes in Olathe and stayed there throughout the day. That morning Williams telephoned defendant and told him that "we could not kill the doctor because we had been seen in the area and it wasn't safe." A telephone bill showed the call was made at 9:36 a.m. Dr. Danforth, according to his son's testimony, some time after 4:30 p.m. went to Loretta's home. Danforth was driving his Chevrolet pickup. Early in the evening defendant, on Highway 5 south of Versailles, met two relatives, Angela Knoll and Julia Cable. Defendant asked them if they would take him to Climax Springs and they did so, arriving about 9:00 p.m. Defendant asked the women to drive him to Loretta's house so he could see how many vehicles were at the house. Dr. Danforth drove by and defendant, upon seeing Danforth, said, "That is who I have been waiting for," and slumped down in the seat. Defendant asked the women to drive to a nearby point where they let him out and

defendant "went down in the woods toward Loretta's house." At 10:15 p.m. Mary Daugherty, who lived "about a block" from Loretta's house, heard "a loud bang." An autopsy later revealed that Danforth was killed by a .45 caliber bullet.

### Monday, August 18, 1980

Defendant made a long distance call to Williams in Olathe and told Williams, "The old man is dead." Williams said, "Maybe Pearcy snuck back and done it," and defendant said, "there was no _____ way." Defendant asked both Julia Cable and Angela Knoll to "be his alibi" for the evening of Sunday, August 17, "because an old man had gotten the _____ beat out of him." On August 26 defendant made a similar request of another relative, Larry Cable.

### Tuesday, August 19, 1980

Dr. Danforth's blood-stained truck was found by the highway patrol.

### Friday, August 22, 1980

Dr. Danforth's body was found. An autopsy revealed bullet wounds to the head and to the chest. The time of death was calculated to include Sunday, August 17 as the possible date of death.

Testifying in his own behalf defendant admitted being with Angela Knoll and Julia Cable on Sunday evening, August 17, when he saw Dr. Danforth. Defendant said, "I slumped down in the seat because I was more or less hiding from him." Defendant admitted that the two women let him out at a point nearby where defendant awaited Williams and Pearcy. According to defendant, Pearcy arrived in Danforth's truck and Williams pulled his car up behind the truck. Williams and Pearcy left the scene. Defendant opened the door of the truck and noticed blood on the seat. Defendant wiped the seat clean. Defendant drove the truck to a remote area where he wiped his fingerprints off the steering wheel and threw away his blood-soaked pants and shirt. Defendant admitted that he had asked his three relatives to provide him with a perjurious alibi.

State's witness, David Hibdon, who was a cellmate of defendant after the latter was jailed, testified that defendant told Hibdon, "I was the one that killed the doctor." Defendant also told Hibdon that he shot Danforth twice and that he had "ditched" the body and the truck.

Defendant's brief says: "The state's proof consisted solely of the fact that defendant, along with many, many others, was in the general location where the murder occurred, at a time when the murder could have occurred." That statement ignores the evidence that defendant hired Williams and Pearcy to do the killing, paid them money to do so, furnished them with photographs of the victim and his vehicle, apprised them of the victim's movements in Kansas City, marked the Danforth car with the bumper sticker, had an argument with the victim on August 14, showed Williams and Pearcy the murder area, arranged for Angela Knoll and Julia Cable to drop him near Loretta's house shortly before the shooting, sought perjurious alibis from three relatives, hid his own blood-soaked clothing, "ditched" the victim's body and the truck, and told his cellmate that he was the murderer. It would be difficult to conceive more incriminating facts, short of actual eyewitness testimony. Defendant's first point has no merit.

Defendant's second point is that the trial court erred in "overruling defendant's motion to voir dire the jury after it had come to defendant's attention that the jury might have received information about the case from the local newspaper."

The jury was selected, but not sworn, on March 2, 1981. On that day, during voir dire examination, counsel for both sides interrogated the prospective jurors concerning pre-trial publicity accorded the case by various news media. At the first recess the court instructed the veniremen as follows:

"It is the court's duty to instruct you upon a matter about which you will be reminded at each recess or adjournment of court. Until this case is given to you to decide, you must not discuss any subject connected with the trial among yourselves, or form or express any opinion about it, and, until you are discharged as jurors, you must not talk with others about the case, or permit them to discuss it with you or in your hearing, or read, view or listen to any newspaper, radio or television report of the trial."

The jury was reminded of the foregoing admonition during later recesses. At 9:00 a.m. on March 4, the third day of the trial and the second day of receiving evidence, defendant's counsel informed the court that he "had in his hand" a copy of an article appearing in the March 3 edition of the Lake Sun, Osage Beach, Missouri. According to counsel the article was headlined, "Jury selected for murder trial," with a sub-headline, "Michael Stith defendant in Danforth case." Counsel dictated into the record the contents of the newspaper report.

Defendant's brief calls this court's attention to the following portions of the newspaper article:

"After jury selection Monday, Stith's attorneys entered a motion to suppress a statement Stith made to Camden County Sheriff Larry Whitten on August 28, the day of Stith's arrest.

"Circuit Judge John Parrish overruled the motion, allowing the statement to be admitted.

"Stith's defense attorneys had contended the statement was made in violation of the defendant's constitutional rights.

"But Parrish ruled that the statement was made voluntarily and thus was not made in violation of Stith's rights."

.　　.　　.　　.　　.

"[Assistant prosecutor] Casteel told the court the state will have 18 witnesses in the case and may call all, or some, of them.

"Among witnesses for the prosecution, he indicated, will be personnel from the Camden County Sheriff's Department, troopers of the Missouri State Highway Patrol, and several individuals including two Kansans who allegedly made attempts on Danforth's

life—Harrison D. Williams and Jack Piercey.

"The prosecution's evidence will be largely circumstantial, Casteel told the court."

.     .     .     .     .

"Casteel said Loretta Danforth, the victim's wife who is charged with conspiracy to commit murder in connection with the killing, will not appear in this trial."

After reading the article counsel asked permission of the court "to voir dire the jury to see if they have formed any opinion based upon the newspaper article." The request was denied.

Defendant's brief states:

"[T]he article contained several extrajudicial pieces of evidence. First, there is the obvious implication that appellant confessed. Second, there is the obvious fact that Loretta Danforth was likewise charged. Further, there were the number of witnesses the state intended to call. All of these items of evidence, perhaps related to the jury by extrajudicial means, were factors which could interfere with a fair trial."

■■■ A motion to voir dire the jury, made during the course of the trial after the jury has been selected, is addressed to the sound discretion of the trial judge and the exercise of that discretion will be disturbed on appeal only when the record shows a manifest abuse of discretion. *State v. Lee,* 654 S.W.2d 876, 879[3] (Mo. banc 1983). When it appears during the course of a trial that the members of the jury may have been exposed to publicity which may be adverse to the defendant, the trial judge must make a determination as to whether the publicity creates a danger of substantial prejudice to the accused. *United States v. Hood,* 593 F.2d 293, 296[7] (8th Cir.1979). "If the trial judge determines that it does, the jurors should then be polled individually to determine whether they have in fact been exposed to the prejudicial information. If any jurors have been so exposed, the trial judge must ascertain the extent and effect of the *infection,* and what measures, including the possible declaration of mistrial, must be taken to protect the rights of the

accused." *Hood,* supra, at p. 296. In that case the trial court denied defendant's request for a poll of the jury because it felt that the information which was publicized "failed to meet the threshold requirement of creating a danger of substantial prejudice to the accused." Although the appellate court stated that it believed the better practice would require the polling of the jury, the trial court, under the circumstances there, did not abuse its discretion in failing to do so. See also *United States v. Alley,* 661 F.2d 718, 721 (8th Cir.1981). Anno. 15 A.L.R.2d 1152 (Interrogation of jurors during criminal trial as to whether they have read newspaper articles pertaining to the alleged crime or the trial).

In *State v. Schlagel,* 490 S.W.2d 81 (Mo. 1973), the supreme court held that the trial court did not err in not questioning the jury as to whether they had read any newspaper articles appearing in the Kansas City Star and Times during the course of the trial. The court pointed out that during the regular voir dire the members of the panel had been questioned in detail concerning their reading of newspaper articles concerning defendant and drug traffic in Clay County. The court also pointed out that the trial court "repeatedly cautioned the jury" against being influenced by anything except the evidence.

■■■ There was no showing with respect to the circulation of the Lake Sun in the county where the trial was held. The jurors had previously been instructed not to read any newspaper report of the trial and there was no showing that the instruction was violated. Although the newspaper article mentions a statement made by defendant to Sheriff Larry Whitten, the article did not mention the contents of the statement. Sheriff Whitten did testify as a state's witness but his testimony dealt primarily with the finding of Dr. Danforth's body and the sheriff did not testify with regard to any statement made by defendant.

Although the article mentions that Loretta was charged with conspiracy, the instant record was replete with testimony concern-

ing Loretta's involvement in the planning of Danforth's murder and there is no showing that the newspaper comment was in any way prejudicial to defendant.

The newspaper article mentioned that the state would have 18 witnesses and in fact the state produced 20 witnesses. The article's brief reference to Williams and Pearcy did not add anything to what their testimony showed.

Although the better practice may have been for the court to have permitted the interrogation of the jury, the instant record does not support a finding that the trial court's denial of the motion constituted manifest abuse of his discretion or that defendant was prejudiced by the ruling. Defendant's second point has no merit.

■ Defendant's third point is that the trial court improperly limited defense counsel's cross-examination of state's witnesses Jack Pearcy and Harrison Williams. During the cross-examination of Pearcy the trial court sustained the prosecutor's objections to the following questions directed to the witness by defense counsel: "Do you use marijuana often?" and "Were you dealing with marijuana?" During cross-examination of Williams the court sustained the prosecutor's objections to the following questions posed by defense counsel: "Do you deal in drugs?" and "Do you use marijuana?"

In *State v. Lynch,* 528 S.W.2d 454, 457–58[4–6] (Mo.App.1975), the court discussed the general rules governing defense counsel's cross-examination of a prosecution witness concerning prior criminal conduct which did not result in a criminal conviction. The court said, "[S]ubject to a witness's claim of right against self-incrimination a witness may be asked questions concerning whether he committed or admitted committing a specific criminal act. The purpose of such questions is to test a witness's credibility, ... [A] witness may be compelled to answer any such question however irrelevant it may be to the facts in issue and however disgraceful the answer may be to himself, except where the answer might expose him to a criminal charge....

[I]f a witness is asked a question of some shameful act for the purpose of discrediting him, the person asking the question is concluded by his answer.... [T]here are two protections afforded the witness: (1) the right against self-incrimination, if properly claimed; and (2) the examiner is concluded by the witness's answer so as to avoid a confusion of issues on collateral matters.... [T]he latitude and extent of cross-examination on collateral issues to show specific misconduct for purposes of impeachment is initially a determination to be made by the trial court within the exercise of its discretion and will be set aside on appellate review only where it is affirmatively shown that the exercise of discretion was abused."

Here neither Pearcy nor Williams sought to invoke his personal privilege against self-incrimination. Although the objections were sustained to the four questions, Pearcy testified, under cross-examination, that Williams had given him $500 of the $1,500 which defendant had given to Williams in Sedalia. Pearcy then said that he was going to invest the money in "smoke," by which, said the witness, he meant "marijuana." He testified that he was going to Springfield to buy marijuana, $500 to $700 worth, that that would be probably a pound of marijuana, that maybe he was going to smoke all of that and that it would take him a couple of weeks. It was at that juncture that Pearcy was asked if he was dealing with marijuana and the court sustained the objection.

Later in his cross-examination Pearcy testified that he and Williams smoked marijuana on the evening of Wednesday, August 13, and that he smoked "a couple of joints." It was at that juncture that Pearcy was asked if he used marijuana often.

Williams testified, on cross-examination, that he and Pearcy, after their rendezvous with defendant in Sedalia on August 12, went to Springfield to buy marijuana but there was none to buy. At that point the witness was asked whether he used marijuana. Although the court did sustain the prosecutor's objection when defense counsel

asked Williams whether he dealt in drugs, later in his cross-examination Williams testified that he did sell drugs because there was money in it and that he had sold drugs in the past.

From the foregoing it is clear that although the trial court sustained objections to the specific four questions, substantially the same information was elicited from each witness by other questions. Williams admitted that he had been convicted of "assault and striking a law officer" and Williams testified that Pearcy "has been convicted of a felony and has been in the penitentiary." The testimony of both Williams and Pearcy with regard to their participation in the murder plot could hardly have had a favorable effect upon their credibility.

In *State v. Warren,* 628 S.W.2d 410 (Mo. App.1982), this court held that "If, in a specific instance, the evidence should not have been excluded, the error is harmless if the same evidence is found in the testimony of the same or other witnesses, given before or after the objection was sustained." This court holds that even if the four questions were "questions concerning whether or not he committed or admitted committing a specific crime," and thus were properly posed, *State v. Lynch,* supra, *State v. Foster,* 349 S.W.2d 922, 925 (Mo.1961), the ruling of the trial court, although erroneous, was not prejudicially so. Defendant's third point has no merit.

The judgment is affirmed.

GREENE, C.J., and TITUS and CROW, JJ., concur.