**STATE of Missouri, Respondent,**

v.

**Bernard WILLIAMS, Appellant.**

**No. WD 42233.**

Missouri Court of Appeals,
Western District.

Aug. 28, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 2, 1990.

Application to Transfer Denied
Nov. 20, 1990.

---

David S. Durbin, Appellate Defender, Terri L. Backhus, Asst. Appellate Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Robert V. Franson, Asst. Atty. Gen., Jefferson City, for respondent.

Before MANFORD, P.J., and KENNEDY and ULRICH, JJ.

ULRICH, Judge.

Bernard W. Williams appeals his conviction by a jury of two counts of forcible rape, § 566.030, RSMo 1986,[1] forcible sodomy, § 566.060, and stealing over $150, § 570.030. He was charged as a class X offender and was sentenced to consecutive terms of twenty years for each of the forcible rape convictions, and twenty years for the sodomy conviction. The sentence imposed for the felony stealing conviction was either a five or seven year consecutive term. This portion of the sentence is disputed. Mr. Williams was sentenced to a total of sixty-five or sixty-seven years in prison. He appeals his convictions. The judgment is affirmed in part and amended in part.

Mr. Williams raises three points on appeal. He contends that the trial court erred by (1) entering written judgment purporting to sentence him to seven years incarceration for stealing over $150 when the court had actually sentenced him to five years, and (2) by permitting his classification as a class X offender. He also claims that (3) he was prejudiced because four jurors had read a newspaper the second morning of trial which contained inadmissible information about the case.

### FACTS

On the morning of May 24, 1988, A.E., a fifteen-year-old female was at home in Kansas City asleep in her bed. She was awakened by someone pulling her hair from behind, thrown to the floor, and her head was covered with a quilt preventing her from identifying her assailant. She was rolled on her back and raped.

A.E. was placed on her bed, and the assailant left the room. The assailant returned with another blanket and used it as an additional binding for A.E.'s head. The assailant again left the room, returned and raped her again. He then attempted to penetrate her anus with his penis. The assailant moved his victim to the floor and placed her on her hands and knees when apparently he heard the victim's mother walk into the house downstairs. He left the victim's room and entered another room on the second floor.

Upon entering the house, the victim's mother called to her daughter. The victim ran down the stairs crying and yelling that she and her mother had to leave the house because she had been raped by someone who was upstairs. Both mother and victim ran from the house and the victim's mother placed her daughter in the family automobile.

A repairman working on the guttering of the house across the street observed mother and victim exit the house. The daughter was crying and screaming. The mother approached him and asked if she could use a telephone. He told her none was available.

The victim's mother reentered her house and proceeded to the kitchen where she obtained a knife. The mother then approached the stairs and the assailant ran by her, approximately five feet away. She observed the assailant's apparel, his hair, his complexion, and his mustache.

The mother exited the house and again ran to the repairman across the street. She told him that a man was in her house. The repairman observed a man exit the rear of the victim's house, enter a vehicle parked in the driveway, drive around the mother's vehicle over a bush and depart at a high rate of speed. The repairman was standing on the street as the assailant drove by him five or six feet away. He saw the assailant's face and upper body. He identified Mr. Williams during the trial as the man he saw leave the house and drive by him.

**1.** All references to Missouri statutes are to the Revised Statutes of Missouri, 1986, unless otherwise stated.

In addition to the observations made within the house, the victim's mother observed the assailant enter the automobile parked in the driveway next to the house, drive the vehicle at a high rate of speed around her automobile and over a bush. As the assailant escaped in the automobile, she also observed the license plate number on the vehicle driven by the assailant.

When police officers arrived at the crime scene, the victim's mother reported the license number appearing on the vehicle driven by the assailant. She described the assailant to the first police officer to arrive as a man 5 feet, 8 inches to 5 feet, 10 inches tall, in his early twenties, having long uncombed hair, dark complexion and weighing between 155 to 170 pounds.

The automobile driven by the assailant from the crime scene had been reported stolen on May 21, 1989, three days before A.E. was raped. On May 26, 1989, two days following the offenses for which Mr. Williams was charged, the Olathe, Kansas, Police Department recovered the reported vehicle and arrested the occupant, Mr. Williams. With his consent, Mr. Williams was taken by Kansas City, Missouri, police officers to the Kansas City, Missouri, Police Department. After his arrival at the police department, a lineup was conducted. Mr. Williams and three other people participated as persons viewed in the lineup. The victim was unable to identify any of the four people in the lineup as her assailant. The victim's mother identified Mr. Williams as the person she saw in her house May 24, 1988.

More than two-hundred dollars in currency and items of personal property were taken from the victim's home. Following the lineup, the victim's mother identified items found in the vehicle driven by Mr. Williams when he was arrested by Olathe police officers as items taken from her home on May 24, 1988.

## POINT 1

For his first point, Mr. Williams claims the court erroneously entered written judgment on July 11, 1989, which purportedly sentenced him to seven years for stealing over $150 when the court had sentenced him to five years orally at the time of sentencing on July 7, 1989. During the sentencing process on July 7, 1989, the court stated:

It is adjudged that the defendant is sentenced and committed to the custody of the Missouri Department of Adult Institutions on Count I for a period of twenty years; Count II, twenty years; Count III, twenty years; *Count V, five years.* I, II and II [sic] consecutive, *Count V concurrent with the others.*[2]

(Emphasis added.)

During the sentencing proceeding defense counsel informed the court that the law requires that non-sex convictions be served consecutively to sex offenses. The assistant county prosecutor in attendance concurred. Defense counsel suggested that the court make the three sex offenses concurrent penalties to each other and the five year sentence for stealing consecutive to the other three sentences. The court emphatically expressed that the three sex offenses were to be served consecutively to each other and acknowledged that the law requires the non-sex conviction be served consecutively to the sex offenses. The court spoke of the stealing offense saying:

And because, as I said earlier, I consider the clothes or the shoes or whatever the stuff was that he stole out of the house to be considerably less serious than the sex offenses, I was considering making that concurrent. But—you're right. I remember now that you can't do that. So it'll be consecutive, also.

Stealing property valued at $150 or more is a class C felony. § 570.030. The maximum penalty for class C felonies is seven years incarceration. § 558.011. The court's expressed intent at the sentencing hearing was to assess five years incarceration for the stealing offense. Had the law permitted, the five year penalty would have been assessed concurrently. The court's expressed intent that the defendant serve five years consecutively to the other sen-

2. The State dismissed Count IV.

tences is inconsistent and conflicting with the written judgment entered a few days later. The written judgment did not accurately reflect the intention expressed by the court during the sentencing process.

■ Judgment is a judicial act of the court. Its entry upon the record is a ministerial act of the clerk. A judgment derives its force from the rendition of the court's judicial act and not from the ministerial act of its entry upon the record. *Massey v. State*, 608 S.W.2d 152, 153 (Mo.App.1980). Between the judicial act of the court in rendering judgment and the ministerial act of entering it upon the record, the rendition controls. *Id.* See also, *United States v. Raftis*, 427 F.2d 1145, 1146 (8th Cir.1970); and *Plant v. State of Missouri*, 608 S.W.2d 91 (Mo.App.1980). The court's sentence imposed during the sentencing process on July 7, 1989, controls and the written judgment filed on July 11, 1989, is erroneous.

■ Appellate courts will not normally remand a case to the sentencing court to correct a sentence where the appellate court can appropriately correct the sentence. Rule 30.23 provides in part that

Unless justice otherwise requires, the court shall dispose finally of the case. The judgment shall not be reversed or set aside because it was erroneous as to the time or place of imprisonment. In such case the appellate court shall sentence such person to the proper place of confinement and for the correct length of time from and after the date of the original sentence.

See also *State v. Hornbuckle*, 746 S.W.2d 580, 587 (Mo.App.1988); *State v. Blank*, 705 S.W.2d 56, 59 (Mo.App.1985). The appellant's sentence will be modified to reflect the intent of the sentencing court as to Count V of the information, and the judgment and sentence will be amended as to Count V requiring the defendant to serve five years consecutively to Counts I, II and III.

### POINT 2

Mr. Williams next contends that he was *improperly classified as a class X offender.* In support of his claim, he argues three subpoints. He first argues that (a) the fingerprint card used to identify him as a prior convicted felon was not self-authenticating or properly admitted as a business record, (b) the documents purporting to be certified copies of prior convictions were not conclusively identified as reflecting records pertaining to him, and (c) even if items (a) and (b) are ruled against him, he argues that the evidence was insufficient to prove that he had served more than one sentence of "not less than 120 days in the Department of Corrections," which is required to enhance punishment pursuant to the Class X offender statute.

§ 558.019.2, RSMo 1988.

Whether the fingerprint card purportedly made of Mr. Williams' fingerprints when he was arrested by Kansas City, Missouri, police officers and used to identify him as a three time convicted felon was properly admitted as a business record exception to the hearsay rule is considered. Three certified and exemplified copies of Texas felony conviction judgments and the fingerprints of the person convicted in each of the Texas felony cases were introduced as exhibits. The fingerprints obtained from Texas were compared with Mr. Williams' fingerprints, purportedly taken when he was arrested, to establish that he committed the Texas felonies.

Alice Chrisman, fingerprint technician of the fingerprint identification unit of the Kansas City, Missouri, Police Department, testified that her job includes classifying, identifying, and searching for fingerprints among fingerprint records when they are needed. She also fingerprints individuals for the police department. She testified that a particular fingerprint card exhibit bearing the name Bernard W. Williams contained ten fingerprints (a ten-point fingerprint card). She was the custodian of this fingerprint card. The card was signed by the person taking the prints in behalf of the police department, a standard operating procedure, and dated and signed by the person whose digits made the prints. She testified that, in the normal course of business at the Kansas City, Missouri, Police Department, a fingerprint card is made of an arrestee when arrested and information about the person is entered on the card. Ms. Chrisman did not personally prepare

the fingerprint card made when Mr. Williams was arrested, nor was she present when the prints were taken. She did not personally know the person whose prints were taken, nor did she know the police department employee who took the prints. Over Mr. Williams' objection, the fingerprint card bearing his name was introduced as evidence.

Section 490.680 states the general requirements for admission of records pursuant to the business records exception to the hearsay rule. The statute states:

A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

The trial court has considerable discretion in determining whether sufficient foundation has been established to support introduction of business records, provided minimal requirements are met. *State v. Carter*, 670 S.W.2d 104, 107 (Mo. App.1984). Fingerprint cards are admissible pursuant to § 490.680 even when the qualifying witness is not the person who took the fingerprints. *State v. Cutts*, 694 S.W.2d 804, 811 (Mo.App.1985). The records custodian testified that standard procedure during arrest includes fingerprinting the arrestee. She testified to the method used to fingerprint persons arrested, and she testified that fingerprints of the person whose prints appeared on the exhibit would have been taken and placed on the exhibit card at or near the time of the arrest, again a standard procedure. The trial court, satisfied with the source of information, method, and time of preparation, admitted the fingerprint card as an exhibit. The trial court did not abuse its discretion, the requirements of § 490.680 having been met. Subpoint (a) is denied.

Mr. Williams contends as subpoint (b) that he was not conclusively identified as the person convicted of three felonies in Texas and, therefore, the court erred by classifying him as a class X offender pursuant to § 558.019, RSMo 1986. Each of the three certified and exemplified copies of convictions included fingerprint records of the person convicted. Mr. Williams' fingerprints, taken at or near the time of his arrest by Kansas City, Missouri, police officers, were compared by Ms. Chrisman to the fingerprints of the person convicted of each of the three Texas felonies and all of the fingerprints were determined to have been made by the same person. A photograph of the person convicted of one of the felonies was included with the record of the offense and it appeared to be a photograph of Mr. Williams. The name of record of the person convicted of each of the felonies was Bernard (spelled Barnard in the record of one conviction) Williams. The recorded dates of birth, however, were not identical in each of the records.

Although Mr. Williams claims the varying birthdates of the convicted person on the records of conviction were significant, the dates are not so diverse, considering the other evidence, that they raise doubt that Mr. Williams was the person convicted in each case. Law enforcement authorities obtain birthdate information by a variety of means, and birthdate information of suspects and convicted persons is used to assist in identification but is not controlling. The two year variance of recorded birthdates on the Texas certified and exemplified records is insignificant considering that Mr. Williams' fingerprints and those of the convicted person in each of the three prior felony cases are identical and his picture is a part of one set of records. See *State v. Hines*, 726 S.W.2d 785, 787 (Mo. App.1987). Photographs and fingerprints included with certified and exemplified copies of conviction records may be used to aid in identifying defendants as persons previously convicted of felonies in the application of enhanced penalty statutes. *State v. McMillan*, 593 S.W.2d 629, 635 (Mo.App. 1980). The evidence introduced to prove that the person convicted in three prior felony convictions was Mr. Williams was substantial and proved prima facie that Mr. Williams committed the three prior felonies. See *State v. Fitzpatrick*, 676 S.W.2d

831, 838 (Mo. banc 1984). Subpoint (b) is denied.

■ Mr. Williams states as subpoint (c) that the state failed to prove he is a class X offender because it did not prove that he was incarcerated 120 days or more for each of three felony convictions. Section 558.-019.4(3) states: "A 'class X offender' is one who has previously pleaded guilty to or has been found guilty of three felonies committed at different times." Section 558.019.2 states in part that:

any defendant who has pleaded guilty to or has been found guilty of a felony *and served time of imprisonment of not less than one hundred twenty days* in the department of corrections and human resources, or *in a penal institution in another state which is equivalent to the department of corrections and human resources,* or federal prison, *the calculation of which shall include any jail time credit* and has been committed to the department of corrections and human resources as a prior offender, persistent offender, or class X offender shall be required to serve the following minimum prison terms:

 *  *  *  *  *  *

(3) If the defendant is a class X offender, the minimum prison term which the defendant must serve shall be eighty percent of his sentence.

(Emphasis added.)

Section 558.019 does not state that for a convicted person to be classified as a class X offender he must have been incarcerated at least 120 days for each of three prior felony convictions. The statute sections read together state that a person who previously pleaded guilty or who was found guilty of "three felonies committed at different times" and who "served time of imprisonment of not less than one hundred twenty days" in a qualifying penal institution qualifies as a class X offender. The legislature is presumed to have intended what the statute says by clear and unambiguous language. *State v. Nevels,* 712 S.W.2d 688, 689–90 (Mo.App.1986).

■ The state introduced evidence that Mr. Williams served more than 120 days in a Texas prison for one of the felonies for which he was convicted. One of the certified and exemplified records introduced disclosed that Mr. Williams was detained in jail beginning April 30, 1984, until June 22, 1984, pending conviction and sentencing. He was sentenced on June 22, 1984, following his plea of guilty, and was given credit for the time he was in jail toward the sentence imposed. He was incarcerated in a Texas penal institution following his sentencing until he was paroled March 18, 1986. Mr. Williams spent more than 120 days in a penal institution of another state equivalent to the department of corrections and human resources for at least one felony conviction. Mr. Williams was properly classified as a class X offender having been previously convicted of three felonies and having previously served not less than 120 days incarceration for a single felony conviction in institutions which satisfy the statutory qualifying provisions. Mr. Williams' second point is denied.

### POINT 3

Mr. William's third and final point contends that the court erred by failing to declare a mistrial when four jurors reported that they had read a newspaper article the second morning of trial that contained inadmissible information about him. The April 5, 1989, *Kansas City Times* newspaper contained an article which referred to the trial testimony of a witness who had testified during the trial the previous day. The paragraph of the article about which Mr. Williams complains contained information which had not been admitted. The paragraph said, "Williams [was] arrested two days later in Olathe. He had been driving the same car which was stolen and had stolen Mr. Joftin's wallet containing $185." The jury had not been informed that the car and money had been stolen.

The court polled the jury to determine whether any jurors had read the newspaper article. Although the courtroom deputy clerk recovered several newspapers from the jury room, only four jurors stated that they had knowledge of the newspaper article. The court and counsel spoke to each of the four jurors individually outside the presence and hearing of all other jurors. Three of the four had read the article, and

the fourth had "skimmed" the article. One juror remembered that the article mentioned the events for which Mr. Williams was charged and that Mr. Williams was arrested two days later in Olathe. He did not remember why Mr. Williams was arrested. A second juror recalled the article in detail. He said that the article included information that the vehicle in which Mr. Williams was arrested was stolen, had been stopped by police officers because the license number of the vehicle had been reported as belonging to a stolen vehicle, and that Mr. Williams was in the vehicle when the police stopped it. A third juror remembered that the article informed of Mr. Williams' arrest in Olathe two days following the crimes for which he was on trial. The fourth juror abandoned the article after he had begun "skimming" it when he realized that it concerned the case he was hearing as a juror. This fourth juror became the jury foreman. The court replaced the second juror, who had remembered the article included information that the vehicle in which Mr. Williams was arrested was stolen, with the alternate juror. Mr. Williams' attorney moved for a mistrial, and the court denied the motion.

When a juror is exposed to publicity potentially adverse to a defendant in a criminal case, the trial court must determine whether the publicity creates danger of substantial prejudice to the accused. *State v. Stith,* 660 S.W.2d 419, 424 (Mo.App. 1983). In this case, the trial court determined that jurors may have been exposed to publicity which may have been adverse to the accused and polled the jury. The court identified with a general question the jury members who had knowledge of the article and inquired individually, outside the presence and hearing of the other jurors, of the four who had some contact with the article to determine whether their contact with the article prejudiced Mr. Williams' right to a fair trial.

The court considered the responses of the four jurors who had read or "skimmed" the article and excused the only juror who remembered the article stated that the vehicle in which Mr. Williams was arrested had been stolen. The court permitted the other three to serve. The trial court has broad discretion to determine whether misconduct of a juror requires a mistrial. *State v. Williams,* 577 S.W.2d 59, 62 (Mo.App.1978). The key consideration is the extent to which the defendant's right to a fair trial has been prejudiced. *Id.* The jury was aware from the evidence that Mr. Williams had been arrested two days following the alleged crimes. Thus, the information remembered by two of the three jurors who had seen the newspaper article, that Mr. Williams was arrested May 26, 1988, did not prejudice Mr. Williams' right to a fair trial. None of the three jurors questioned and retained read or remembered that Mr. Williams was driving a stolen car when he was arrested. Mr. Williams' third point is denied.

The judgment on Count V is modified to impose a sentence of five (5) years in the custody of the department of corrections and human resources, to run consecutively to the consecutive twenty (20) years incarceration imposed for each of Counts I, II, and III, for a total period of incarceration of sixty-five years. As a class X offender, Mr. Williams is compelled by § 558.019.2 to serve eighty (80) percent of the total sentence of sixty-five years as a minimum prison term. In all other respects, the judgment is affirmed.

All concur.